FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ JAN 03 2012 ★

BROOKLYN OFFICE

KUNTZ, J.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

PCS WIRELESS, LLC

     Plaintiff,

v.

A TO Z WIRELESS SOLUTIONS INC.,
YOSSI ZAK A/K/A YOSSI ZAKLIKOWSKI,
AVI SCHECTER, YEHUDA ECKHAUS, THE
OEM SHOP, JOHN DOES (1-10), AND ABC
CORPS (1-10).

     Defendants.

Civil Action No. _____

**VERIFIED COMPLAINT AND
DEMAND FOR JURY TRIAL**

NO 12.   -7

     PCS Wireless, LLC ("PCS"), by and through its counsel, Schenck, Price, Smith & King,

LLP, by way of Verified Complaint against A TO Z WIRELESS SOLUTIONS INC., YOSSI

ZAK A/K/A YOSSI ZAKLIKOWSKI, AVI SCHECTER, YEHUDA ECKHAUS, THE OEM

SHOP alleges as follows:

## THE PARTIES

    1.    PCS is a distributor of telecommunications equipment, including cellular

telephones and refurbished cellular telephones.

    2.    A to Z Wireless ("A to Z") is a distributor of telecommunications equipment,

including cellular telephones.

    3.    A to Z operates in Brooklyn, New York.

    4.    Yossi Zak a/k/a Yossi Zaklikowski is an officer or owner of A to Z.

    5.    Yehuda Eckhaus is an officer or owner of A to Z.

    6.    Avi Schecter is an officer or owner of A to Z.

    7.    Upon information and belief, The OEM Shop is the on-line retail division of A to

Z through which the inventory of A to Z is sold through outlets like Amazon.com.

8.   Upon information and belief, The OEM Shop is a separately formed corporation owned by defendants Zak, Eckhaus, and Schecter.

## JURISDICTION AND VENUE

9.   The amount in controversy in this matter exceeds $75,000.00.   Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §1332.   Further, declaratory relief is sought under and by virtue of 28 U.S.C. § 2201, 2202.

10.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(a).

11.   This Court has personal jurisdiction over the defendants pursuant to Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure.   Defendants reside in the State of New York and/or have engaged in transactions and/or business within the State from which this action arises.

## GENERAL ALLEGATIONS

### *The Parties Historic Dealings*

12.   A to Z has been a customer of PCS and has purchased from PCS a variety of telecommunications products.

13.   Over the years that PCS and A to Z have done business they have engaged in a course of conduct pursuant to which:

a.   A to Z calls in product orders to PCS's New Jersey headquarters.

b.   PCS fills the product orders by shipping products from PCS's New Jersey warehouse to A to Z's place of business at 5620 1st Avenue, 4th Floor, Brooklyn, New York.

c.   PCS invoices A to Z via an electronic billing system.

      d.  A to Z is required to pay PCS upon delivery of the product being shipped with post-dated checks covering the full amount of the shipment.

14.     Pursuant to the course of conduct between the parties, PCS would deliver product to A to Z and simultaneously A to Z would provide to PCS post-dated checks in an amount equal to the value of the shipment. PCS would cash those checks on the dates noted on the checks. The post-date on these checks could range between a few days to a few weeks after PCS delivered the product to A to Z.

15.     As a result of this course of conduct PCS had in its possession at any one time checks worth hundreds of thousands of dollars that could be cashed only several days or weeks in the future. PCS's possession of these checks gave PCS some security that it would be paid by A to Z. These checks are referred to below as "Post-Dated Checks."

16.     As a result of the post-dated payment terms PCS has historically extended to A to Z and the volume of business conducted by the two parties it was common for A to Z to be indebted to PCS on a day-to-day basis between $500,000 to $1,000,000.

### *Personal Guarantee and Commercial Security Agreement*

17.     In or about May 2011, in light of PCS's extension of substantial credit to A to Z the defendants in the person of Yossi Zak and PCS negotiated a series of agreements designed to protect PCS in the event A to Z defaulted on the credit terms PCS extended to it.

18.     On or about May 17, 2011, A to Z representative, defendant Yossi Zak signed a personal "Guaranty Agreement" that made defendant Zak personally liable for any credit extended by PCS to A to Z. A true and accurate copy of the May 17, 2011 Guaranty Agreement is annexed **Exhibit A** to Pasternak's Affidavit.

19.    At the time defendant Zak executed the Guaranty Agreement he represented to PCS that he was the President of A to Z.

20.    The rights under the Guaranty Agreement include: (1) allowing PCS to recover from Zak any amounts owed by A to Z to PCS without PCS having to first attempt to make any recovery against A to Z; (2) entitling PCS to recover any costs or expenses, including attorneys fees, incurred by PCS in pursuit of payments owed by A to Z; (3) Zak consenting to the venue and jurisdiction of any court in which PCS chooses to file suit to enforce its rights under the Guaranty Agreement; (4) Zak waiving any right to a jury trial in a claim by PCS pursuant to the Guaranty Agreement; and (5) Zak consenting to entry of a Confession of Judgment.

21.    On or about May 17, 2011, A to Z representative Yossi Zak also signed on behalf of A to Z a "Commercial Security Agreement" that gave certain rights to PCS over various property of A to Z in consideration of the credit PCS extended to A to Z.  A true and accurate copy of the May 17, 2011 Collateral Security Agreement is annexed as **Exhibit B** to Pasternak's Affidavit.

22.    Again, when defendant Zak executed the Commercial Security Agreement he represented to PCS that he was the President of A to Z with power to bind A to Z to that agreement.

23.    The Commercial Security Agreement covered all extensions of credit by PCS to A to Z and provided to PCS: (1) a security interest in collateral, which was defined as "all assets of the Debtor [A to Z]"; (2) a promise by A to Z that it would not remove the secured collateral from its existing location without written permission from PCS; (3) a promise by A to Z that it would assemble the collateral at a place demanded by PCS in the event A to Z defaulted under

the Commercial Security Agreement; (4) the right to sell any assets of A to Z; and (5) a right to collect any accounts owed to A to Z.

24.     PCS's instant application is little more than an exercise of the rights the defendants granted to it in the form of the Personal Guarantee and Commercial Security Agreement.

### The Specific Transactions at Issue

25.     Although A to Z continued to make payments to PCS for some goods, A to Z had failed to make payment to PCS on substantial invoices issued as far back as July 2011.  True and accurate copies of invoices regarding 22 transactions between July 26, 2011 and September 6, 2011 are annexed as **Exhibit C** to Pasternak's Affidavit.

26.     In or about September 2011, A to Z owed to PCS approximately $1,300,000 for product that PCS had shipped to A to Z.

27.     In or about the first week of September 2011, A to Z approached PCS and sought to place an order for 25,000 "Pixi" cellular telephones, which A to Z sought to sell on Amazon.com in a "Deal of the Day" promotion through A to Z's on-line division, The OEM Shop.

28.     A to Z and The OEM Shop intended to market these goods for sale on Amazon.com.

29.     PCS indicated to A to Z that the sale price for the Pixi order would be $750,000.

30.     This would have been one of the largest transactions between PCS and A to Z, but A to Z was asking to make this substantial transaction at a time when A to Z's debt to PCS was already at a historically high level.

31.     In light of the balance A to Z already owed to PCS, PCS indicated that it could make the Pixi sale only on the following terms: (1) 12,500 Pixis worth $375,000 would be delivered to A to Z on September 6, 2011; (2) A to Z would send $200,000 to PCS by wire transfer on September 6, 2011; (3) PCS would deposit $160,000 worth of Post-Dated Checks on September 6, 2011, when such checks were scheduled to be deposited on September 12, 2011; (4) A to Z would further reduce its credit balance between September 6 and September 20, 2011; (5) PCS would deliver the remaining 12,500 Pixis worth another $375,000 on September 20, 2011; (6) A to Z would pay to PCS $275,000 by October 6, 2011; and (7) A to Z would pay to PCS the final installment of $275,000 by November 6, 2011.

32.     On or about September 6, 2011, A to Z agreed to carry out the terms of this agreement in order to purchase the Pixis.

33.     On or about September 6, 2011, pursuant to these terms PCS shipped 12,500 Pixis to A to Z, PCS deposited $160,000 in Post-Dated Checks, and A to Z wired $200,000 to PCS.

34.     On or about September 7, 2011, and contrary to the terms of the transaction, Zak called PCS on behalf of A to Z and demanded that PCS ship the second batch of 12,500 Pixis.

35.     Under the terms of the agreement PCS was not scheduled to ship the second batch of 12,500 Pixis until later and only if A to Z further reduced its underlying credit balance owed to PCS.

36.     In response to Zak and A to Z's demand for expedited shipment of the second batch of Pixis, PCS indicated that the early shipment could be made only if A to Z made payments to further bring down the amount it owed to PCS.

37.     Over the next 7 to 10 days representative of PCS, including Zak and Schecter, on behalf of A to Z continued to discuss A to Z's demand for expedited shipment of the second batch of Pixis and PCS's requirement that A to Z pay down its indebtedness to PCS.

38.     The parties were unable to agree upon terms under which PCS was willing to extend further credit to A to Z, A to Z refused to make further payments against its balance to PCS, and the parties agreed to reverse the Pixi transaction.

39.     Pursuant to the agreement to reverse the transaction, A to Z agreed to return the initial 12,500 Pixis to PCS in exchange for PCS returning the $200,000 A to Z had wired to PCS.

40.     In order to carry out that reverse transaction, on or about September 16, 2011, PCS sent a truck to A to Z's place of business in order to collect the 12,500 Pixis, and PCS was prepared to return the funds that A to Z had previously wired to PCS.

41.     On September 16, 2011, A to Z refused to allow PCS to load onto its truck the 12,500 Pixis.  After PCS's driver waited for approximately 6 hours while PCS attempted to persuade A to Z to abide by the parties' agreement, PCS instructed its driver to leave A to Z without the Pixis.

42.     Upon information and belief, after the September 16, 2011 impasse A to Z put stop payments on the Post-Dated Checks worth several hundred thousand dollars that were in PCS's possession and which PCS had always required in order to extend credit to A to Z.

43.     On September 19, 2011, Avi Schecter wrote an email to PCS indicating the following:

> PCS Wireless has breached the agreement and commitment it entered into with A to Z Wireless Solutions.  As a result, A to Z has been damaged.  Please be advised that PCS is in possession of post-dated checks issued from A to Z Wireless.  The checks were given to PCS in advance of the date of the checks.  When the checks were delivered to PCS, A to Z Wireless was expecting funds that would be sufficient to pay the amounts of the checks.  PCS accepted the post-dated checks and extended credit to A to Z Wireless.  A

to Z Wireless financial circumstances have deteriorated since the checks were written. A to Z Wireless has encountered numerous problems with PCS Wireless products. A to Z has stopped payment on all checks issues to PCS Wireless.

A true and accurate copy of this email is annexed as **Exhibit D** to Pasternak's Affidavit.

44.     To ensure that A to Z had breached its agreement, PCS attempted to deposit one of the post-dated checks on or about September 29, 2011. The check was dated September 26, 2011 and it was made in the amount of $48,132.00. A true and accurate copy of this check is annexed as **Exhibit E** to Pasternak's Affidavit. The check was not deposited and was returned because A to Z wrongly issued a "stop payment." The "Post-Dated Check" was stamped "DO NOT RE-DEPOSIT."

45.     True and accurate copies of the other 16 "Post-Dated Checks" fraudulently provided to PCS by A to Z are annexed as **Exhibit F** to Pasternak's Affidavit.

### *A to Z Continues to Sell PCS's Products on Amazon*

46.     Importantly, A to Z's claim that it has "encountered numerous problems with PCS Wireless products" is completely unfounded because A to Z continues to sell the very products PCS supplied.

47.     Over the course of many months, PCS acted as a consumer in the marketplace and purchased its own phones on Amazon.com from The OEM Shop and/or A to Z Wireless Solutions. Annexed as **Exhibit G** to Pasternak's Affidavit are invoices reflecting PCS's online purchases on or about August 11, 17, 23, 24, 25, 30, and 31, 2011; September 23, 2011; October 5 and 10, 2011; and November 10, 2011.

48.     Perhaps more alarming is the fact that A to Z is selling the phones it obtained from PCS at a unit price less than the amount it agreed to pay PCS per phone. Therefore, not

only is A to Z failing to pay PCS for the phones, but its actions in selling the units at a loss alone suggest that it will have no ability to pay PCS for the phones.

### A to Z Breaches yet another Agreement to Resolve the Issues Between the Parties

49.    On several occasions since September 16, 2011, PCS and representatives from A to Z, including Yossef "Zak" Zaklikowski have communicated regarding the debt owed by A to Z.

50.    During one meeting, A to Z promised to pay the outstanding sums to PCS and supplied PCS with additional post-dated checks.   A to Z representative, Yossef "Zak" Zaklikowski, also promised to sign and deliver a separately executed personal Guaranty of Payment for the owners of A to Z.

51.    As a result, A to Z provided checks dated October 25, 2011 totaling $39,790.86, November 1, 2011 totaling $30,000, and November 2, 2011 totaling $39,790.86 to apply to the outstanding debt.  PCS attempted to deposit these checks pursuant to the parties' agreement, but each check was denied because A to Z again put a Stop Payment on the checks.  True and accurate copies of the denied checks are annexed as **Exhibit H** to Pasternak's Affidavit.

52.    A to Z also provided additional checks dated November 7, 2011 totaling $106,550, dated November 14, 2011 totaling $9,100, and dated November 18, 2011 totaling $35,400.  True and accurate copies of the denied checks are annexed as **Exhibit I** to Pasternak's Affidavit.  PCS has not attempted to deposit these checks considering A to Z's multiple stop payment orders.

53.    PCS also attempted a settlement at the beginning of November 2011 and engaged A to Z in discussions regarding a payment plan of approximately $40,000 per month. Ultimately, these talks also broke down.

54.   Most recently, PCS engaged Yossef "Zak" Zaklikowski in discussions regarding the debt owed to PCS. Mr. Zaklikowski made several statements indicating that A to Z has "no interest" in paying its debt to PCS. Mr. Zaklikowski also claimed that he was removing himself from the business and all questions regarding payment should be directed to Avi Schecter. However, Mr. Zaklikowski acknowledged that Mr. Schecter was evading all communication attempts by PCS. It was not until these statements that the urgency of this matter became readily apparent.

***A Writ of Attachment and Preliminary Restraints***
***are required if PCS is ever to become Whole***

55.   Upon information and belief, Zak, Schecter, and Eckhaus were the officers or owners of A to Z who decided that A to Z should refuse to return the Pixis to PCS and should cancel the Post-Dated Checks A to Z provided to PCS in order to induce PCS to extend credit to A to Z.

56.   To the extent they have not already been sold, A to Z remains in possession of the initial 12,500 Pixis and other products previously sold to them and refuses to return them to PCS.

57.   Upon information and belief, all defendants have arranged to have the 12,500 Pixis sold and distributed by The OEM Shop, which is owned by defendants Zak, Schechter, and Eckhaus.

58.   A to Z is indebted to PCS for approximately $985,205.78. A true and accurate copy of the A to Z Balance Sheet is annexed as **Exhibit J** to Pasternak's Affidavit.

59.   Zak is the personal guarantor of A to Z's debt owed to PCS and, therefore, he is indebted to PCS in the amount of $985,205.78 pursuant to the Guaranty Agreement.

60.     Upon information and belief, because The OEM Shop took possession of goods that it and its owners Zak, Schecter, and Eckhaus knew it was not entitled to possess, Zak, Schecter, and Eckhaus are indebted to PCS.

61.     PCS has demanded payment from A to Z, The OEM Shop, Zak, Schecter, and Eckhaus and those defendants have refused to make payment.

62.     A to Z concedes in Avi Schecter's email dated September 19, 2011 that "PCS accepted the post-dated checks and extended credit to A to Z Wireless." A to Z also concedes that its "financial circumstances have deteriorated since the checks were written." This was confirmed by the second round of bad checks A to Z passed off in October.

63.     It is now imperative that immediate Court intervention take place to secure the assets of A to Z so that PCS may ultimately be paid back for the credit it extended to A to Z.

## FIRST COUNT
### (Breach of Contract)

64.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs of this Verified Complaint as if set forth fully herein.

65.     Defendants are in breach of the Agreement and as a result of the breach, plaintiff has suffered damages.

WHEREFORE, plaintiff demands judgment in its favor and against the defendants for $985,205.78, plus compensatory damages, consequential damages and incidental damages, together with lawful interest, attorneys' fees, costs of suit, and any other relief the Court deems appropriate.

## SECOND COUNT
### (Promise to Pay)

66.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs of this Verified Complaint as if set forth fully herein.

67.    The plaintiff sues the defendants for goods and services rendered and sold by the plaintiff to the defendants, upon the promise by the defendants to pay the plaintiff for all products sold and/or shipped to defendants.

68.    Payment has been demanded of defendants but has not been made.

WHEREFORE, plaintiff demands judgment in its favor and against the defendants for $985,205.78, plus compensatory damages, consequential damages and incidental damages, together with lawful interest, attorneys' fees, costs of suit, and any other relief the Court deems appropriate.

**THIRD COUNT**
**(Reasonable Value of Goods/Services)**

69.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs of this Verified Complaint as if set forth fully herein.

70.    The plaintiff sues the defendants for the reasonable value of the goods and services rendered and sold by the plaintiff to the defendants upon the promise of the defendants to pay a reasonable price for same.

71.    Payment has been demanded but has not been made.

WHEREFORE, plaintiff demands judgment in its favor and against the defendants for $985,205.78, plus compensatory damages, consequential damages and incidental damages, together with lawful interest, attorneys' fees, costs of suit, and any other relief the Court deems appropriate.

**FOURTH COUNT**
**(Unjust Enrichment)**

72.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs of this Verified Complaint as if set forth fully herein.

73.    The defendants have been unjustly enriched by obtaining goods and services from plaintiff which was for the benefit of defendants without paying plaintiff for same.

WHEREFORE, plaintiff demands judgment in its favor and against the defendants for $985,205.78, plus compensatory damages, consequential damages and incidental damages, together with lawful interest, attorneys' fees, costs of suit, and any other relief the Court deems appropriate.

## FIFTH COUNT
### (Breach of Covenant of Good Faith and Fair Dealing)

74.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs of this Verified Complaint as if set forth fully herein.

75.    The Agreement between the parties includes and incorporates an implied covenant of good faith and fair dealing.

76.    Defendants have breached the covenant of good faith and fair dealing by not acting in good faith toward plaintiff and by failing to pay plaintiff despite promises and averments to the contrary.

77.    As a result, plaintiff has suffered damages and will continue to suffer damages.

WHEREFORE, plaintiff demands judgment in its favor and against the defendants for $985,205.78, plus compensatory damages, consequential damages and incidental damages, together with lawful interest, attorneys' fees, costs of suit, and any other relief the Court deems appropriate.

## SIXTH COUNT
### (Conversion)

78.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs of this Verified Complaint as if set forth fully herein.

79.    Defendants unlawfully took goods from plaintiff to which they were not entitled.

80.    As a result of the conversion of the goods by defendants, plaintiff has sustained damages and will continue to suffer damages.

WHEREFORE, plaintiff demands judgment in its favor and against the defendants for $985,205.78, plus compensatory damages, consequential damages and incidental damages, together with lawful interest, attorneys' fees, costs of suit, and any other relief the Court deems appropriate.

**SEVENTH COUNT**
**Fraud**

81.    PCS repeats and realleges each and every allegation set forth in the preceding paragraphs of this Verified Complaint as if set forth fully herein.

82.    Defendants made certain promises and/or representations in the Defendants Documents and subsequent communications with the intent that PCS would rely on them.

83.    The promises and/or representations made by defendants were false, were made with defendants' knowledge of their falsity and were relied upon by PCS to its detriment. Defendants' actions constitute legal and equitable fraud and as a result of said fraud, PCS has suffered damages and will continue to suffer damages.

WHEREFORE, plaintiff demands judgment in its favor and against the defendants for $985,205.78, plus compensatory damages, consequential damages and incidental damages, together with lawful interest, attorneys' fees, costs of suit, and any other relief the Court deems appropriate.

By: _____
John P. Campbell (JC 8746)
SCHENCK, PRICE, SMITH & KING, LLP
220 Park Avenue
P. O. Box 991
Florham Park, NJ  07932
(973) 539-1000
Attorneys for Plaintiff

## VERIFICATION

I, Abraham Pasternak, am the Chief Operating Officer of PCS Wireless, LLC, the plaintiff herein. The allegations contained within the Verified Complaint are true to the best of my knowledge, information and belief.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Abraham Pasternak

Dated: December 28, 2011